Byron De La **BECKWITH**,
VI, Petitioner,

v.

James V. **ANDERSON**, Commissioner,
Mississippi Department of Corrections, and the Attorney General of the
State of Mississippi, Respondents.

No. 3:99–CV–413BN.

United States District Court,
S.D. Mississippi,
Jackson Division.

Feb. 24, 2000.

Merrida P. Coxwell, Jr., Charles Richard Mullins, Coxwell & Associates, PLLC, Jackson, MS, for plaintiff.

Jo Anne McFarland McLeod, Jerrolyn M. Owens, Office of the Attorney General, Jackson, MS, for defendants.

## OPINION AND ORDER

BARBOUR, District Judge.

This cause is before the Court on Petition Under Title 28 U.S.C. § 2254 for Writ of Habeas Corpus by Petitioner Byron De La Beckwith, who is in state court custody under a sentence of life imprisonment. Having considered the Petition, Answer, all attachments to each, and supporting and opposing authority, the Court finds

that the Petition for Habeas Corpus Relief is not well taken and should be denied.

In the Petition for Writ of Habeas Corpus Relief, Beckwith requested the Court to conduct an evidentiary hearing, and requested authorization to conduct additional discovery. In a letter to the Court dated December 7, 1999, counsel for Beckwith withdrew these requests.[1] Therefore, the request for an evidentiary hearing and the request for additional discovery are denied as moot.

## I. *Factual Background and Procedural History*

This Petition for Habeas Corpus Relief (hereinafter "Petition") arises out of the conviction and subsequent life sentence of Petitioner Byron De La Beckwith for the murder of civil rights leader Medgar Evers. Evers was the first Field Secretary for the National Association for the Advancement of Colored People in the State of Mississippi. Evers was murdered at his home in Jackson, Mississippi on June 12, 1963. Beckwith, a self-avowed white supremacist and pro-segregationist, was arrested and charged with the murder of Evers on June 23, 1963. The Hinds County grand jury indicted Beckwith with Evers' murder during its July, 1963, term.

In 1964, Beckwith stood trial for the murder of Evers on two occasions. The first trial took place in February, 1964, and the second trial occurred in April, 1964. Because of hung juries, both trials resulted in mistrials. Following the second trial, Beckwith was released on $10,000.00 bond. On March 10, 1969, the district attorney in charge of Beckwith's case moved the court to enter a *nolle prosequi*[2] of the indictment. On the same day, the three circuit judges of the Seventh Circuit Court District signed and entered an order granting a *nolle prosequi.* No objection was raised by the defense to

entry of the *nolle prosequi*. Some time after his release from custody, Beckwith moved from Mississippi to Tennessee.

Although the murder of Medgar Evers received considerable attention over the years, no effort was made by the State of Mississippi to re-initiate criminal proceedings against Beckwith until 1990. During the December, 1990, term of the Hinds County grand jury, Beckwith was again indicted for the murder of Evers. Following an extradition contest in the Tennessee court system, Beckwith was extradited to Mississippi. Beckwith's request for bail was denied. The circuit court's denial of bail was affirmed by the Mississippi Supreme Court on March 25, 1992.

In April, 1992, Beckwith moved the circuit court for dismissal of the indictment. The motion for dismissal cited three constitutional grounds, namely (1) denial of the right to a speedy trial, (2) denial of due process rights, and (3) double jeopardy. Beckwith's motion for dismissal was denied on August 4, 1992. Beckwith then petitioned the Mississippi Supreme Court for an interlocutory appeal, which was granted on August 26, 1992. *Beckwith v. State*, 615 So.2d 1134 (Miss.1992), *cert. denied*, 510 U.S. 884, 114 S.Ct. 232, 126 L.Ed.2d 187 (1993) (hereinafter "*Beckwith I*"). In *Beckwith I*, the court dismissed without prejudice Beckwith's interlocutory appeal as to his speedy trial and due process claims, holding essentially that those claims were premature but could be raised again on appeal in the event of Beckwith's conviction. Additionally, the Mississippi Supreme Court affirmed the circuit court's denial of Beckwith's double jeopardy claim. The case proceeded to jury trial in 1994, resulting in Beckwith's conviction for the murder of Evers. Beckwith was sentenced to life imprisonment.

---

**1.** On February 18, 2000, the Court delivered that letter to the Clerk of the Court with the directions that it be filed as a withdrawal of Beckwith's request for an evidentiary hearing and for authorization to conduct additional discovery.

**2.** Under Mississippi law, the entry of a *nolle prosequi* unconditionally dismisses a criminal indictment, but without prejudice to the state to seek re-indictment. *Beckwith v. State*, 707 So.2d 547, 569 (Miss.1997).

Feeling aggrieved by the jury's verdict, Beckwith again appealed to the Mississippi Supreme Court.[3] *Byron De La Beckwith, VI v. State,* 707 So.2d 547 (Miss.1997), *cert. denied,* 525 U.S. 880, 119 S.Ct. 187, 142 L.Ed.2d 153 (1998) (hereinafter *"Beckwith II"*). Affirming the trial court's verdict, the Mississippi Supreme Court held:

1) Beckwith's due process rights were not violated by the 26 year delay between the second mistrial in 1964 and the second indictment in 1990;

2) Racist letters indicating Beckwith's involvement in the Ku Klux Klan were relevant to establish motive;

3) The circuit court's refusal to allow trial testimony from the second 1964 trial to be read into evidence during the 1994 trial did not constitute error;

4) Impeachment of witnesses through use of grand jury testimony did not constitute error;

5) Admission of photographs of Evers' body in its casket did not constitute undue prejudice; and

6) Transfer of venue for jury selection based on racial demographics did not violate Beckwith's right to an impartial jury or right to equal protection.

See *Beckwith II,* 707 So.2d 547 (Miss. 1997).

Having exhausted all state court remedies, Beckwith petitioned this Court for habeas corpus relief. The Petition, which seeks relief from Beckwith's conviction and life sentence, was filed on June 15, 1999. The following three grounds for habeas corpus relief are stated in the Petition. The grounds are:

1) Violation of Beckwith's Sixth Amendment right under the United States Constitution to a speedy trial caused by the 26 year delay which began in 1964 and ended with Beckwith's re-indictment in 1990;[4]

2) Violation of Beckwith's Fifth Amendment due process right under the United States Constitution to a speedy trial because the State waited 26 years to put him to trial.[5] The 26 year delay allegedly crippled Beckwith's defense due to the deaths of witnesses, Beckwith's loss of memory and the loss of evidence; and

3) Violation of Beckwith's right to a fair trial and right to due process under the Fifth Amendment, and violation of Beckwith's compulsory process rights under the Sixth Amendment to the United States Constitution.[6] These constitutional claims arise from alleged discovery violations relating to five witnesses who either testified in Beckwith's 1994 trial, or were prohibited from testifying by the trial court.

## II. *Analysis*

### A. Applicable Law / Standard of Review

Beckwith brings this Petition under 28 U.S.C. § 2254, which states in relevant part:

(a) [A] district court shall entertain an application for a writ of habeas corpus ... pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

---

**3.** A detailed recitation of the facts of the case *sub judice* is included in *Beckwith II,* 707 So.2d at 554–65.

**4.** The Speedy Trial Clause of the Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...."

**5.** The Due Process Clause of the Fifth Amendment to the United States Constitution states:

"No person shall ... be deprived of life, liberty, or property, without due process of the law...."

**6.** The Sixth Amendment to the United States Constitution states in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor...."

(d) An application for a writ of habeas corpus ... pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus ... pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C.A. § 2254.

 The Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA], Pub.L. 104–132, 110 Stat. 12144, amended 28 U.S.C. § 2254 to include the contents § 2254(d). AEDPA became effective on April 26, 1996, the date on which President Clinton signed the act.[7] Under AEDPA, pure questions of law and mixed questions of law and fact are reviewed under subsection (d)(1), whereas questions of fact are reviewed under subsection (d)(2). *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir. 1998) (citing *Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir.1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997), *implicitly overruled on other*

*grounds by Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). When reviewing a purely legal question, a federal court may grant habeas relief "only if it determines that a state court's decision rested on a legal determination that was 'contrary to ... clearly established federal law as determined by the Supreme Court.'" *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir.1997), *cert. denied*, 521 U.S. 1123, 117 S.Ct. 2518, 138 L.Ed.2d 1019 (1997) (citing *Drinkard*, 97 F.3d at 768, *implicitly overruled on other grounds by Lindh*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481)).

 "Under the AEDPA deference scheme, a federal court will not disturb a state court's application of law to facts unless the state court's conclusions involved an 'unreasonable application' of clearly established federal law as established by the Supreme Court." *Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir.1998) (citing 28 U.S.C. § 2254(d)(1)) (other citations omitted). For a state court's application of federal law to be "unreasonable," it must be "so clearly incorrect that it would not be debatable among reasonable jurists." *Nobles v. Johnson*, 127 F.3d 409, 418 (5th Cir.1997), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998) (citing *Drinkard*, 97 F.3d at 769, *implicitly overruled on other grounds by Lindh*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481)). In other words, "an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *Drinkard*, 97 F.3d at 769, *implicitly overruled on other grounds by Lindh*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481; *Davis*, 158 F.3d at 812 (citations omitted); *Corwin*, 150 F.3d at 471–72 (citation omitted). Unless rebutted by clear

---

**7.** Whether AEDPA applies hinges upon the date that the petition for habeas corpus is filed, rather than the date of the underlying conviction. *See Miller v. Johnson*, 200 F.3d 274, 280 (5th Cir.2000) (citing *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 2068,

138 L.Ed.2d 481 (1997)). AEDPA is applicable to all federal habeas corpus petitions filed after April 26, 1996. *Id.* Beckwith's petition for habeas corpus was filed on June 15, 1999; therefore, the standards of AEDPA apply to his petition.

and convincing evidence, state court factual findings are presumed to be correct. *Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir.1998), *cert. denied,* 526 U.S. 1041, 119 S.Ct. 1339, 143 L.Ed.2d 503 (1999) (citing 28 U.S.C. § 2254(e)(1)).

Each of Beckwith's three grounds for habeas corpus relief is analyzed under the constraints of 28 U.S.C. § 2254 and case law interpretations of the applicable provisions of § 2254.

Beckwith's three grounds for habeas relief, 1) Sixth Amendment right to a speedy trial, 2) Fifth Amendment due process right to a speedy trial and 3) Fifth Amendment due process right to a fair trial and Sixth Amendment right to compulsory process, are all mixed questions of law and fact. Therefore, the Court analyzes these issue under the standards of 28 U.S.C. § 2254(d)(1). In *Beckwith II,* the Mississippi Supreme Court rejected all of Beckwith's Constitutional claims, affirming his conviction and sentence. *Beckwith II,* 707 So.2d at 604 This Court must uphold the decision of the Mississippi Supreme Court unless it is found to be so clearly incorrect that reasonable jurists could not disagree that the decision was erroneous. *See Nobles,* 127 F.3d at 418 (citation omitted).

## B. Beckwith's Sixth Amendment Right to a Speedy Trial

### (1) Time Period Over Which Beckwith's Right to a Speedy Trial Extends

As a preliminary issue, the Court must determine the time period over which Beckwith's Sixth Amendment protection extends. The Commissioner of the Mississippi Department of Corrections and the Mississippi Attorney General [hereinafter "Respondents"] contend that the protection extends from the time of Beckwith's second mistrial on April 17, 1964, through entry of the *nolle prosequi* on March 10, 1969, a period of almost five years (1,787 days). Beckwith contends that his Sixth Amendment speedy trial protection extends from the second mistrial on April 17, 1964, until the prosecution re-indicted him

in December, 1990, a period of over twenty-six years.

The general rule regarding the time period utilized in calculating speedy trial violations was set forth by the United States Supreme Court in *United States v. Loud Hawk,* 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986). The Court held that the Sixth Amendment does not protect a defendant from all effects flowing from pre-trial delays. *Id.* at 311, 106 S.Ct. at 654. "[W]hen no indictment is outstanding, only the 'actual restraints imposed by arrest and holding to answer a criminal charge ... engage the particular protections of the speedy trial provision on the Sixth Amendment.'" *Id.* at 310, 106 S.Ct. at 653 (citing *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971)); *see also, United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982). Under the general rule set forth in *Loud Hawk,* the Sixth Amendment speedy trial right applies only to time periods when a person is either under indictment or under arrest.

The United States Supreme Court discussed the intent behind the speedy trial clause of the Sixth Amendment in *United States v. MacDonald.* In *MacDonald,* the Court held:

> The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time.... The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*MacDonald,* 456 U.S. at 8, 102 S.Ct. at 1502. The holding in *MacDonald* supports the general rule set forth in *Loud Hawk.*

The decision in *United States v. Avalos,* 541 F.2d 1100 (5th Cir.1976), *cert. denied,*

430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977), represents an exception to the general rule set forth in *Loud Hawk*. Beckwith asserts that *Avalso* is controlling under the circumstances of his case. In *Avalos,* the defendants were originally arrested in Washington, D.C. *Id.* at 1108–09. After the defendants were arrested in Washington, the warrants were dismissed before the case proceeded to trial. *Id.* at 1109 n. 13. However, after dismissal of the District of Columbia arrest warrants, the defendants were arrested and tried for the same crimes in Florida. *Id.* at 1108–09. In granting defendants motion to dismiss for lack of a speedy trial, the trial court held that the government was forum shopping. *Id.* at 1105. Analyzing the point in time at which the right to a speedy trial attaches, the court held that the basis for the arrest is critical. *Id.* at 1109 (citation omitted). "[T]he arrest warrants were dismissed [in Washington, D.C.] not because of unrelated charges pending in another court, but in order to prosecute the same charges in another court." *Id.* at 1109 n. 13. Under this fact scenario, the court held that the right to a speedy trial attached at the time of the original arrest in Washington, D.C. *Id.* at 1109.

■ The holding in *Avalos* is an exception to the general rule set forth in *Loud Hawk*. However, *Avalos* applies only under similar factual circumstances. The case *sub judice* does not present a fact scenario similar to the facts in *Avalos*.[8] Beckwith's indictment was not dismissed in 1969 in order to resume the prosecution in another jurisdiction, and thus did not constitute "forum shopping" as in *Avalos*. Therefore, the general rule set forth in *Loud Hawk,* that Sixth Amendment speedy trial protection extends *only* to time periods when the defendant is under indictment or under arrest, applies to

Beckwith's case. The time period in which Beckwith was either under indictment or under arrest covers April 17, 1964, through March 10, 1969. Consequently, this Court finds that the time period over which Beckwith's right to a speedy trial under the Sixth Amendment extends is from the time of his second mistrial on April 17, 1964, through entry of the *nolle prosequi* on March 10, 1969.

### (2) Analysis: Beckwith's Sixth Amendment Speedy Trial Right

At issue is whether the delay of almost five years (1,787 days) from Beckwith's second mistrial on April 17, 1964, until the date that the indictment was dismissed on March 10, 1969, constitutes an unreasonable delay in violation of Beckwith's Sixth Amendment right to a speedy trial. The Sixth Amendment to the United States Constitution guarantees all criminal defendants the right to a speedy trial. In *Beckwith II,* the Mississippi Supreme Court held that Beckwith's Sixth Amendment right was not violated by the delay. *Beckwith II,* 707 So.2d at 604. Because the issue was decided on the merits by the Mississippi Supreme Court, this Court will not disturb the ruling unless "reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *See Drinkard,* 97 F.3d at 769, *implicitly overruled on other grounds by Lindh,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481; *Davis,* 158 F.3d at 812 (citations omitted); *Corwin,* 150 F.3d at 471–72 (citation omitted).

A brief factual foundation is repeated for a clear understanding of this issue. Beckwith was initially arrested for the murder of Medgar Evers on June 23, 1963. He was tried for Evers' murder on two occasions in 1964. Both trials ended in mistri-

---

**8.** Although Beckwith's Petition argues for application of *Avalos* to his case, counsel for Beckwith admitted in oral argument before the Mississippi Supreme Court that under a Sixth Amendment to the United States Constitution speedy trial analysis, only the time period from Beckwith's second mistrial in 1964, to entry of the *nolle prosequi* in 1969, is considered. *See* Answer, Exhibit "A," Memorandum of Authorities in Support of Respondent's Answer, Exhibit "2," Supreme Court Oral Argument, p. 2, lines 23–27.

al, the first on February 7, 1964, and the second on April 17, 1964. Beckwith was released on $10,000.00 bond after the second mistrial. The charges against Beckwith were dismissed on March 10, 1969, by the entry of the *nolle prosequi* by the State.

Analysis of whether Beckwith's Sixth Amendment right to a speedy trial was violated requires application of a four factor balancing test described by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The United States Court of Appeals for the Fifth Circuit succinctly summarized the *Barker* factors as follows: "(1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right, and (4) the prejudice to the defendant." *Robinson v. Whitley*, 2 F.3d 562, 568 (5th Cir.1993), *cert. denied*, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994) (citation omitted). The Court will both independently analyze each *Barker* factor and consider whether the Mississippi Supreme Court analyzed the factors in a reasonable manner.

**(a) length of delay**

■ This "length of delay" test serves not only as the initial *Barker* factor, but also as a triggering mechanism for the remaining three *Barker* tests. *Id.* (citation omitted). In other words, if the length of delay reaches a threshold level at which it is regarded as "presumptively prejudicial," then findings must be made on the remaining three factors. *Id.* at 568. A delay of one year or more is sufficient to trigger a Sixth Amendment speedy trial analysis. *Id.*

■ In the case *sub judice*, almost five years elapsed between the date of Beckwith's second mistrial on April 17, 1964, and entry of the *nolle prosequi* on March 10, 1969. In *Beckwith II*, the Mississippi Supreme Court correctly held that the delay was presumptively prejudicial, requiring analysis and balancing of the four *Barker* factors. *See Beckwith II*, 707 So.2d at 566.

**(b) reason for the delay**

In *Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir.1994), *cert. denied*, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994), the Fifth Circuit considered issues that must be analyzed under the "reason for delay" *Barker* factor. The court held:

> A deliberate and intentional delay by the prosecution for the purpose of hindering the defense or otherwise gaining a tactical advantage is weighed heavily against the state. An unintentional and inadvertent delay, however, is weighed much less heavily. Where the state advances valid reasons for the delay, or the delay is attributable to acts of the defendant, this factor is weighed in favor of the state.

*Id.* at 647 (citing *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192. The Mississippi Supreme Court held that Beckwith was responsible for delay in question. *Beckwith II*, 707 So.2d at 566–67. Under the deference standard of AEDPA, this Court will not disturb the state court finding unless it is an unreasonable application of law to the facts. *Davis*, 158 F.3d at 812 (citing 28 U.S.C. § 2254(d)(1)) (other citations omitted).

Holding that the "reason for delay" factor weighed against Beckwith, the Mississippi Supreme Court relied on two bodies of evidence. *Beckwith II*, 707 So.2d at 567. First, the court relied on a newspaper article published in the December 18, 1990, issue of the Clarion Ledger, the primary newspaper publication in Jackson, Mississippi. *Id.* The article was presented to the trial court by Beckwith's counsel. *Id.* Quoting District Attorney Ed Peters, the article states:

> Peters said he had been skeptical of the chances of a new prosecution in the Evers case. "The question of a new trial had been raised before, including at the 20th anniversary of Evers' death," Peters said. "It had always been my belief that the law would bar prosecution of this case, and I had always proceeded on this theory." Peters said .... *"Until*

*the Sovereignty Commission files, I never got past speedy trial, prior jeopardy, missing witnesses, missing evidence, dismissal of the indictment, mistrials. There were just too many things standing in the way,"* Peters said. *The jury tampering question raised by the Sovereignty Commission records made Peters look at the case again.* "I don't think what they did was morally right, but it wasn't legally wrong," Peters said of a Sovereignty Commission investigator's attempts to gather evidence about potential jurors. The Jurors themselves were not contacted before the trial. "Once the jury tampering investigation was opened, [Assistant District Attorney Bobby] DeLaughter expressed the opinion that it possibly would be tryable. I got him to look into it. He and two of our investigators have spent just untold days on putting the pieces back together," Peters said. "I would call it more of an evolution into the prosecution than just a headlong leap into, 'This is justice.'" Peters said.

*Id.* at 567 (emphasis added). Based on this newspaper article and files from the now defunct Mississippi State Sovereignty Commission (hereinafter "Sovereignty Commission")[9], a state agency, the Mississippi Supreme Court concluded that the Sovereignty Commission, unbeknownst to the prosecution at the time, aided Beckwith's defense during the two trials in 1964. *Id.* at 567.

The second evidentiary factor relied upon by the Mississippi Supreme Court in holding that Beckwith caused the delay at issue was a statement made by Beckwith himself. *Id.* Mark Reiley was a witness for the State at trial. *Id.* In a conversation between Reiley and Beckwith, Beckwith stated "that he had 'the power and

connections' in Mississippi to avoid incarceration for 'getting rid of that nigger, Medgar Evers.'" *Id.* The Mississippi Supreme Court construed Beckwith's statements as "admitted complicity in thwarting the aims of fair and impartial justice." *Id.* Therefore, the "reason for delay" factor was weighed against Beckwith. *Id.*

A central issue in Beckwith's argument that the "reason for delay" factor weighs in his favor revolves around the question of which party bears the burden of proving the reason for trial delay. Beckwith alleges that Respondents must provide sufficient reasons for the delay, otherwise the Court is required to weigh this factor in his favor. Beckwith further alleges that Respondents have not met their burden of proof. In support of this proposition, Beckwith cites *United States v. Rogers,* 781 F.Supp. 1181 (S.D.Miss. 1991). In *Rogers,* the court assigned the burden of justifying the delay to the government because "the government was clearly responsible for the ... delay." *Id.* at 1186. In contrast, the Mississippi Supreme Court in *Beckwith II* concluded that Beckwith was responsible for the delay. *Beckwith II,* 707 So.2d at 567. This Court acknowledges that it would have preferred for the Mississippi Supreme Court to have given more extensive reasoning for its decision. However, the deference scheme of § 2254(d) requires only that the decision of the state court is a reasonable application of law to the facts. The Mississippi Supreme Court provided two independent fact based reasons for its finding that Beckwith was responsible for the delay. The reasons include the Clarion Ledger newspaper article referring to the Sovereignty Commission's involvement in the 1964 trials, and incriminating statements

---

9. The Sovereignty Commission was legislatively created in 1956, by Miss.Code Ann. § 3–1–11. As an agency of the State of Mississippi, it was created ostensibly to "protect the sovereignty of the State of Mississippi, and her sister states" from interference by the federal government. *American Civil Liberties Union of Mississippi v. Fordice,* 969 F.Supp.

403, 405 (S.D.Miss.1994). However, the understood purpose of the Sovereignty Commission was to "maintain racial segregation in the South despite orders to the contrary by the United States Supreme Court." *Id.* (citations omitted). The Sovereignty Commission was abolished by act of the Mississippi legislature in 1977.

made by Beckwith himself. The findings of the state court, although brief, do meet the "reasonableness" standard of § 2254(d). Therefore, because Beckwith was responsible for the trial delay, the holding in *Rogers* does not apply to the case *sub judice.*

Beckwith further relies on a series of Mississippi state court cases to support his argument that Respondents carry the burden of proving that Beckwith caused the trial delay. *See Jenkins v. State,* 607 So.2d 1137 (Miss.1992); *State v. Ferguson,* 576 So.2d 1252 (Miss.1991); *Beavers v. State,* 498 So.2d 788 (Miss.1986). However, in supporting a Sixth Amendment speedy trial claim under § 2254, reliance on state court case law is misguided. Section 2254 states that a writ of habeas corpus will not be granted unless the underlying state court decision "was contrary to, or involved an unreasonable application of, clearly established *Federal law....*" 28 U.S.C. § 2254(d)(1) (emphasis added). Based on the foregoing findings, Beckwith's argument that Respondents have failed to meet their burden of proof is not well taken.

Beckwith presents three additional arguments supporting his proposition that the "reason for delay" factor of the *Barker* analysis favors him. First, the FBI and local prosecutors had a close working relationship.[10] Because of this close working relationship, Beckwith reasons that a third trial should have taken place before entry of the *nolle prosequi* in 1969. Second, Beckwith contends that neither he nor his counsel caused the delay.[11] Third, after Peters assumed the district attorney position in 1972, he acknowledged that the prosecution was discussed several times.[12]

Therefore, Beckwith alleges that the third trial should have occurred at a substantially earlier date.

As to Beckwith's first two arguments, the Mississippi Supreme Court found that because of interference by both the Sovereignty Commission and Beckwith himself, efforts to retry Beckwith were thwarted. Neither a close working relationship between state and federal agencies nor self-serving statements by Beckwith and his attorney provide sufficient reasoning under the deference standard of AEDPA for this Court to disturb the state court finding. The third argument concerning statements made by District Attorney Peters is of no consequence because of the timing of the statement. The time frame covered by this Court's Sixth Amendment speedy trial analysis is from 1964 through 1969. Peters did not take office until 1972, outside of the time frame in question. For these reasons, the final three arguments made by Beckwith do not persuade the Court that the "reason for delay" *Barker* factor should be weighed in his favor.

The Mississippi Supreme Court found that the "reason for delay" *Barker* factor favored the State. This Court finds that the state court ruling was a reasonable application of federal law to the available facts. Therefore, under the deference standard of AEDPA, the state court ruling will not be disturbed.

**(c) assertion of the right**

The third factor considered by the Court is whether Beckwith asserted his right to a speedy trial. Prior to the *Barker* decision, most states recognized the "demand rule." *Barker,* 407 U.S. at 524, 92 S.Ct. at 2188.

---

10. Supporting evidence includes a "Memorandum to all Agents" in which the FBI, in 1963, informed all agents in the region to assist in the Evers investigation in any way possible. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, Exhibit "T."

11. Beckwith supports this argument with his own testimony in *Beckwith I* (*see* Memorandum Brief in Support of Petitioner Byron De

La Beckwith, VI's Petition for Habeas Corpus, Exhibit "K," pp. 55, 71–74), the affidavit testimony of one of his trial attorneys in 1964 (*Id.* at Exhibit "O"), and his own affidavit testimony (*Id.* at Exhibit "Q").

12. Supporting evidence includes a newspaper article in the Clarion Ledger dated December 18, 1990. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, Exhibit "W."

Under the "demand rule," a defendant waives his Fifth Amendment right to a speedy trial during any period that no demand for trial is made. *Id.* at 525, 92 S.Ct. at 2189. In *Barker,* the United States Supreme Court rejected the "demand rule." *Id.* at 528, 92 S.Ct. at 2191. The Court held:

> We reject ... the rule that a defendant who fails to demand a speedy trial forever waives his right. This does not mean, however, that the defendant has no responsibility to assert his right. We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right.

*Barker,* 407 U.S. at 528, 92 S.Ct. at 2191 (internal footnote omitted). The Court noted that failure to assert the right to a speedy trial complicates the determination of whether the right was violated. *Id.* at 532, 92 S.Ct. at 2193. However, "courts should 'indulge every reasonable presumption against waiver'" of the right to a speedy trial. *Id.* at 525, 92 S.Ct. at 2189 (citation omitted).

Weighing this factor against Beckwith, the Mississippi Supreme Court in *Beckwith II* stated:

> There was no assertion of the speedy trial right. Beckwith argues that several newspaper clippings and one document opposing a mental evaluation establish proof that he asserted his right to a speedy trial. All of these clippings, and the document in question, concern the time period prior to Beckwith's earlier trials. No proof of any sort suggests that Beckwith requested or wanted a third trial.

*Beckwith II,* 707 So.2d at 567. This Court agrees with the holding of the Mississippi Supreme Court.

Beckwith cites eight sources which allegedly indicate that he requested a speedy trial. The first source is the Response of Defendant to the Suggestion of Insanity and Motion for Mental Examination of the Defendant, which was filed in the Circuit Court of the First Judicial District of Hinds County, Mississippi, on July 13, 1963. *See* Petition for Writ of Habeas Corpus, Exhibit "Y." This Motion was filed in relation to Beckwith's first murder trial. Arguing against the Motion for Mental Examination, Beckwith's counsel stated "that among his constitutional rights which will be violated by such an examination ... are his right to a speedy trial." *Id.*

The second through fifth sources that Beckwith cites supporting his allegation that a speedy trial request was made are newspaper articles published in either the Commercial Appeal in Memphis, Tennessee, or the Jackson Daily News in Jackson, Mississippi. *See* Petition for Writ of Habeas Corpus, Exhibit "Z," Exhibit "AA," Exhibit "BB," and Exhibit "CC." The publication dates of the articles range from August 9, 1963, through November 20, 1963. *Id.* All of the articles refer to Beckwith's speedy trial rights. However, all of the articles relate to Beckwith's initial murder trial. *Id.* None refer to the possibility of a third trial subsequent to the two mistrials in 1964.

Both Beckwith's Response to the Motion for Mental Examination and all of the referenced newspaper articles concern Beckwith's request for a speedy trial prior to the first two mistrials in 1964. No evidence is presented in any of those sources indicating that Beckwith sought a speedy trial between the time of the second mistrial in 1964, and the time of entry of the *nolle prosequi* in 1969. Because the time frame at issue in this Petition for Habeas Corpus Relief begins at the date of the second mistrial in April, 1964, none of Beckwith's first five sources support his proposition that he requested a speedy trial prior to entry of the *nolle prosequi* in 1969.

The sixth source relied on by Beckwith is a quote from the hearing in which counsel for Beckwith argued for dismissal of the 1990 re-indictment. *See* Petition for Writ of Habeas Corpus, Exhibit "K," Transcript, Denial of Motion to Dismiss Indict-

ment. During the hearing, Beckwith stated that he was "available" for trial from the time of the second mistrial in 1964, through entry of the *nolle prosequi* in 1969. *Id.* at 21–22. Additionally, Beckwith alleges that during that time frame, he asked his attorneys to seek a third trial or to take steps to "[t]hrow the thing out ... the best way you can...." *Id.* at 70–74. There is no evidence that his attorneys did anything to try to accomplish Beckwith's stated objective.

The seventh source cited in support of Beckwith's claim that a speedy trial was requested is a sworn affidavit by Beckwith. In the affidavit, Beckwith stated that both he and his lawyers were prepared and available for a third trial. *See* Petition for Writ of Habeas Corpus, Exhibit "Q," Affidavit of Byron De La Beckwith. The eighth and final source relied upon by Beckwith is the affidavit of Hardy Lott. *See* Petition for Writ of Habeas Corpus, Exhibit "O," Affidavit of Hardy Lott. Lott was one of the attorneys who represented Beckwith at the 1964 murder trials. *Id.* Referring to the time frame from the second mistrial in 1964, through entry of the *nolle prosequi* in 1969, Lott stated "[d]uring that time I did nothing on Beckwith's behalf to delay or prevent a third trial of the murder case, but was expecting that a third trial would occur and remained ready for trial." *Id.*

■ The sixth through eighth sources relied upon by Beckwith in support of his allegation that a speedy trial was requested are not well taken. All of these sources indicate that Beckwith and his attorneys were *ready* for trial during the 1964 through 1969 time frame, but none prove that either Beckwith or his attorneys *requested* a third trial. Being prepared for trial does not meet the requirement of requesting a trial. Therefore, these sources of information cannot support

Beckwith's claim that his Sixth Amendment right to a speedy trial was violated.

Beckwith has presented no evidence indicating that he requested a trial from the time of the second mistrial in 1964, through entry of the *nolle prosequi* in 1969. For this reason, the Court will not disturb the finding of the Mississippi Supreme Court that Beckwith failed to request a third trial. The third *Barker* factor weighs in favor of Respondents.

### (d) prejudice to the defendant

The fourth and final *Barker* factor requires the Court to consider whether a delay in bringing Beckwith to trial prejudiced Beckwith's defense in any way. Analyzing this factor, the Mississippi Supreme Court in *Beckwith II* recognized that "when the length of delay is presumptively prejudicial, the burden of persuasion is on the state to show that the delay did not prejudice the defendant." *Beckwith II*, 707 So.2d at 567. However, the defendant must show that the delay actually prejudiced his defense in some manner. *Id.* Otherwise, this prong of the *Barker* test must be weighed against the defendant. *Id.* Refusing to weigh this factor against the State, the Mississippi Supreme Court concluded that Beckwith presented no evidence supporting his allegation of prejudice. *Id.* at 568. In fact, during the five year period in question, the court found that all material evidence was preserved. *Id.* This Court agrees with the findings of the Mississippi Supreme Court.

■ Concerning possible prejudice to the defendant resulting from a trial delay, the United States Supreme Court has identified three interests to consider.[13] *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. The interests are: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and

---

13. For clarification purposes, the Court distinguishes between *"Barker* factors" and *"Barker* interests." "Barker factors" are the four factors that the Court must weigh to determine whether Beckwith's Sixth Amend-

ment speedy trial right was violated. *Barker* factor four covers prejudice to the defendant resulting from a trial delay. The *"Barker* interests" are three sub-elements that must be analyzed under *Barker* factor four.

(iii) to limit the possibility that the defense will be impaired." *Id.* (citations omitted).

The first interest identified by *Barker*, prevention of oppressive pretrial incarceration, does not apply to the case *sub judice*. Beckwith was released on bail after the second mistrial in April, 1964. He remained free on bail until the indictment was dismissed via a *nolle prosequi* in March, 1969. Therefore, the first interest weighs in favor of neither Beckwith nor the Respondents.

Beckwith argues that the second interest identified in *Barker*, minimization of anxiety and concern over a pending trial, should be weighed in his favor. During arguments before the Hinds County Circuit Court concerning Beckwith's motion to dismiss the 1990 re-indictment, Beckwith was asked "how did the fact that this matter was hanging over your head affect you, Mr. Beckwith?" *See* Petition for Writ of Habeas Corpus, Exhibit "K," Transcript, Denial of Motion to Dismiss Indictment, p. 22. Beckwith answered "it affected me in every way that carrying a burden of murder unjustly on a man's shoulders and his family had to carry all that, too, so it was double, triple and quadruple burden. . . ." *Id.* Beckwith further alleged that he and his friends were under a financial burden due to the alleged unjust murder indictment. *Id.* at 36.

The United States Court of Appeals for the Fifth Circuit analyzed the level of anxiety necessary to trigger an effective prejudice claim by a defendant. *Cowart*, 16 F.3d at 647. "Anxiety about one's reputation and private life during pretrial delay . . . will not alone suffice to warrant a reversal of a conviction." *Id.* (citation omitted). Furthermore, "[a]nxiety of the sort 'present to some degree in virtually every case' does not amount to actual prejudice." *Avalos*, 541 F.2d at 1115 (citations omitted). Applying these standards to Beckwith's Petition for Habeas Corpus Relief, this Court finds that the level of anxiety suffered by Beckwith does not rise to the level of prejudice. Anxiety about one's personal and/or family life is inadequate to

trigger a finding of prejudice. Also, financial strains imposed by a criminal prosecution are of the type of anxiety suffered to some degree in all cases. Therefore, the second interest set forth in *Barker* does not weigh in favor of Beckwith.

The third interest set forth in *Barker* is an interest in limiting the possibility that the defense will be impaired. Of the three interests, this is the most important. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. Fairness of the criminal justice system hinges upon this interest. *Doggett v. United States*, 505 U.S. 647, 654, 112 S.Ct. 2686, 2692, 120 L.Ed.2d 520 (1992) (citation omitted).

 The concern of this Court in determining whether Beckwith's defense was impaired relates to proof of impairment caused by the delay. "[A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim[,]" because "time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Id.* at 655, 112 S.Ct. at 2692–93 (citations omitted). Citing *Doggett*, the Fifth Circuit summarized three situations in which a criminal defendant must show varying degrees of prejudice. *Robinson*, 2 F.3d at 570 (citing *Doggett*, 505 U.S. at 656–57, 112 S.Ct. at 2693). The degree of proof that a defendant must provide in each of the three situations varies inversely with the amount of fault assigned to the government for the delay. *Robinson*, 2 F.3d at 570 (citation omitted). In the first situation, if the government was reasonably diligent in bringing the defendant to trial, then the defendant must show "specific prejudice to his defense." *Id.* (citation omitted). At the opposite end of the spectrum, if the government inexcusably caused the delay, then the delay presents "an overwhelming case for dismissal." *Id.* (citation omitted). The middle ground is referred to as "official negligence." *Id.* (citation omitted). If the government's conduct falls into neither of the aforementioned categories, then the court must "determine what portion of the delay is attrib-

utable to the Government's negligence and whether this negligent delay is of such a duration that prejudice to the defendant should be presumed." *Id.* at 570 (citation omitted).

With these tests in mind, this Court considers whether Beckwith was prejudiced by the delay beginning with his second mistrial in April, 1964, and ending with entry of the *nolle prosequi* in March, 1969. As analyzed above, this Court concluded that Beckwith himself was responsible for the delay. *See supra,* section II.B.(2)(b) of this Opinion and Order. Therefore, under the standards set forth in *Robinson,* Beckwith must come forward with specific prejudice to his defense.

Beckwith recites twenty-four elements in support of his allegation of prejudice caused by the delay. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, pp. 23–30. Of the twenty-four elements cited by Beckwith, only one falls within the time frame between 1964 and 1969. All other elements concern prejudice to Beckwith at his third trial in 1994. As found by this Court above, the time frame covered by Beckwith's Sixth Amendment right to a speedy trial is from the date of his second mistrial in April, 1994 through entry of the *nolle prosequi* in March, 1969. *See supra,* section II.B.(1) of this Opinion and Order. Therefore, only the one event which occurred between 1964 and 1969 is considered.

The only prejudicial occurrence cited by Beckwith between 1964 and 1969 was the death of Sam Warren, who was a defense witness in Beckwith's second trial in 1964. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, p. 24. At Beckwith's first trial, prosecution witness Lee Swilley testified that he could positively identify Beckwith. *Id.* During Beckwith's second trial, Warren impeached Swilley. *Id.* Warren testified that Swilley lied about his capability to identify Beckwith. *Id.* Warren died on November 14, 1968. Therefore he could not have testified had

the State decided to proceed with a third trial between the date of his death in 1968, and the date of entry of the *nolle prosequi* in 1969.

This Court must determine whether the death of Warren prejudiced the defense of Beckwith. A diligent "search for prejudice" reveals none. Beckwith was not re-tried in 1969; the charges against him were dismissed via a *nolle prosequi.* In *Doggett,* the Court stated that "excessive delay presumptively compromises the reliability of a *trial* ... " *Doggett,* 505 U.S. at 655, 112 S.Ct. at 2693 (emphasis added). Because no trial occurred during the time frame in question, Beckwith could not have been prejudiced by Warren's death. There was no need for Warren's testimony because no trial took place; the charge against Beckwith was dismissed. For this reason, the third interest set forth in *Barker* cannot be weighed in favor of Beckwith.

As found by the Mississippi Supreme Court in *Beckwith II,* none of the three interests detailed in *Barker* support a showing of prejudice resulting from the delay beginning at Beckwith's second mistrial in April, 1964, and ending when the indictment was dismissed in March, 1969. Therefore, the fourth and final *Barker* factor, prejudice to the defendant, is weighed in favor of the Respondents.

**(3) Conclusion, Beckwith's Sixth Amendment Speedy Trial Right**

Finding that Beckwith's Sixth Amendment right to a speedy trial was not violated, the Mississippi State Supreme Court in *Beckwith II* held:

> Our balancing of the Barker factors for this five-year period weighs in favor of the State. Even though the amount of time is counted against the State, the defendant's complicity with the Sovereignty Commission's involvement in the prior trials contributed to the delay; the defendant did not assert his right to a trial during this period; and no prejudice resulted from a nolle prosequi of all

counts against Beckwith, since all material evidence had been preserved from prior proceedings.

*Beckwith II,* 707 So.2d at 568. Under the deference scheme of AEDPA, this Court will not disturb the ruling of the Mississippi Supreme Court unless the conclusions of the court involve an unreasonable application of clearly established federal law. *See Davis,* 158 F.3d at 812 (citations omitted). No unreasonable application of federal law is found in the decision of the Mississippi Supreme Court. Therefore, Beckwith's prayer for habeas corpus relief based on his Sixth Amendment speedy trial right should be denied.

Although a finding that the holding of the state court was in accord with federal law is sufficient to comply with the deference standard of AEDPA, this Court analyzed the *Barker* factors independently. Based on this Court's own analysis of the *Barker* factors, an independent conclusion is made that Beckwith's Sixth Amendment right to a speedy trial was not violated. The Court particularly emphasizes *Barker* factor four, prejudice to the defendant. Beckwith was not retried in 1969; the indictment against him was dismissed. Because the charge against Beckwith was dismissed rather than retried, it is clear that Beckwith was not prejudiced. For this reason and all of the foregoing reasons, the Court finds that Beckwith's Sixth Amendment speedy trial right was not violated. Habeas corpus relief cannot be granted based on the alleged violation of Beckwith's Sixth Amendment right to a speedy trial.

## A. Beckwith's Fifth Amendment Due Process Right to a Speedy Trial

At issue is whether Beckwith's Fifth Amendment due process right was violated by the delay in re-indicting him until 1990. A brief review of the facts is necessary for a clear understanding of this issue. Beckwith was tried for the murder of Evers on two occasions in 1964. Both trials ended in mistrial because of hung juries. In 1969, the indictment against Beckwith was dismissed upon entry of a *nolle prosequi.* In 1990, after the Sovereignty Commission files which revealed the Sovereignty Commission had assisted Beckwith with his jury selection were released to the public, the State re-indicted Beckwith for the murder of Evers. The State alleges that the re-indictment was based on new information contained in the Sovereignty Commission files. The new information allegedly indicated that both Beckwith and the Sovereignty Commission participated in obstructing the prosecution of Beckwith during the two trials in 1964. Beckwith was retried for Evers' murder in 1994. The trial resulted in Beckwith's conviction and a sentence of life imprisonment. Beckwith alleges that from the time of the second mistrial in 1964, until the re-indictment in 1990, defense witnesses died or became unavailable; witnesses, including Beckwith himself, lost their ability to remember key facts and events; and critical exculpatory evidence was lost. As a result, Beckwith further alleges that he was denied his Fifth Amendment due process right because of the pre-indictment delay.[14]

The issue of whether Beckwith's Fifth Amendment due process right was violated by the delay in his re-indictment was fully litigated before the Mississippi Supreme Court. Based on the deference scheme of AEDPA, this Court will not disturb the holding of the Mississippi Supreme Court unless "reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *See Drinkard,* 97 F.3d at 769, *implicitly overruled on other grounds by Lindh,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481; *Davis,* 158 F.3d at 812 (citations omitted); *Corwin,* 150 F.3d at 471–72 (citation omitted). Furthermore, unless the application of law to the facts by the Mississippi Supreme Court is an unreasonable applica-

---

**14.** The time period from Beckwith's second mistrial in 1964, to the re-indictment in 1990, was about twenty-six years. The time period from dismissal of Beckwith's indictment in 1969 to his re-indictment in 1990 was about twenty-one years.

tion of federal law, the state court findings will not be overturned. *See Davis*, 158 F.3d at 812. Based on these standards, the Court considers applicable federal law regarding due process violations resulting from pre-indictment delay.

 Potential prejudice to a defendant caused by pre-indictment delay is analyzed under the due process clause of the Fifth Amendment to the United States Constitution. *United States v. Byrd*, 31 F.3d 1329, 1339 (5th Cir.1994) (citing *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (other citations omitted). "[T]he Speedy Trial Clause [of the Sixth Amendment] has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." *MacDonald*, 456 U.S. at 7, 102 S.Ct. at 1501. Based on the holdings in *Byrd* and *MacDonald*, the Court analyzes the delay in re-indicting Beckwith under the due process clause of the Fifth Amendment.

 With regard to pre-indictment delay, statutes of limitations provide a defendant's primary protection and "the Due Process Clause has a *limited* role to play in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) (citations omitted) (emphasis added). The Mississippi statute of limitations governing criminal charges does not impose a limitation period on the crime of murder. Miss.Code Ann. § 99–1–5 (1999). Therefore, Beckwith's only protection against pre-indictment delay is the due process clause of the Fifth Amendment.

 To successfully assert a Fifth Amendment due process violation for pre-indictment delay, the defendant must satisfy a two factor test. *United States v. Willis*, 583 F.2d 203, 207 (5th Cir.1978) (citations omitted). First, the defendant must show that the prosecuting authority intentionally delayed the indictment with the intent to gain a tactical advantage.

*United States v. Beszborn*, 21 F.3d 62, 65–66 (5th Cir.1994) (citation omitted), *cert. denied*, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 288 (1994); *Willis*, 583 at 207 (citations omitted) Second, the defendant must prove actual prejudice resulting from the delay. *Beszborn*, 21 F.3d at 66 (citation omitted); *Willis*, 583 F.2d at 207 (citations omitted). The burden of proving these two factors lies with the defendant. *Willis*, 583 F.2d at 207. "The court derived this two-pronged test from a construction of the Supreme Court's holding in *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)." *Id.* Following is an analysis of the two-pronged test as applied to Beckwith's case.

### (1) Factor # 1: Whether the State Intentionally Delayed the Re-indictment of Beckwith in Order to Gain a Tactical Advantage

Two distinctive sub-issues fall under this topic. The first is whether the State intentionally delayed Beckwith's re-indictment to gain a tactical advantage. The second is whether Beckwith can claim a due process violation in the absence of proven intentional delay by the State. In other words, the Court must decide whether the two-prong test described above is an "and" test, requiring satisfaction of both the intentional delay element and the prejudice to the defendant element to successfully assert a due process violation, or whether the test is an "or" test, requiring a balancing of the two factors.

### (a) Whether the State Intentionally Delayed the Re-indictment of Beckwith

 "To prove that pre-indictment delay violated his due process rights, a defendant must demonstrate' that the prosecutor *intentionally* delayed the indictment to gain a tactical advantage...." *Byrd*, 31 F.3d at 1339 (citations omitted) (emphasis added). The mere passage of time is insufficient to support a due process claim, even if the time lapse prejudiced the de-

fense. *Dickerson v. Guste*, 932 F.2d 1142, 1144 (5th Cir.1991) (citations omitted), *cert. denied*, 502 U.S. 875, 112 S.Ct. 214, 116 L.Ed.2d 172 (1991). The United States Court of Appeals for the Eleventh Circuit correlates an "intentional delay" with a delay motivated by "bad faith." *See United States v. Foxman*, 87 F.3d 1220, 1223 n. 2 (11th Cir.1996). The Eleventh Circuit defines a "bad faith" government motive as follows:

> [T]he words "bad faith" ... mean that the government acted to delay an indictment, hoping that the delay—in and of itself—would prejudice the defense. In "bad faith" cases, the government intentionally acts to delay; and the tactical advantage sought is the prejudice to the defendant which the government anticipates will flow from the delay.
>
> But, bad faith in this sense or in the sense of a subjective sinister motive is not critical to a due process violation for pre-indictment delay. *The critical element is that the government makes a judgment about how it can best proceed with litigation to gain an advantage over the defendant and, as a result of that judgment, an indictment is delayed.*

*Id.* (emphasis added). In the context of a due process violation resulting from pre-indictment delay, the Court adopts the definition of the Eleventh Circuit for the term "intentional delay."

■ Analyzing the issue of whether the State intentionally delayed the re-indictment of Beckwith, the Mississippi Supreme Court in *Beckwith II* held:

> The question of whether the State intentionally delayed re-indictment of Beckwith is ... answered by newspaper articles cited by Beckwith. In an August 17, 1987 article in The Clarion Ledger, District Attorney Ed Peters was quoted as follows: "There is no way under any stretch of the law that this case could be tried again. Anyone having the first class in law school ought to know that." As is further clarified by Mr. Peters' later statements in the previously mentioned December 18, 1990 article, the State never anticipated bringing new charges against Beckwith until the earlier involvement of the State Sovereignty Commission in Beckwith's defense was discovered. These statements establish satisfactorily that the State never intentionally delayed prosecution to gain tactical advantage.

*Beckwith II*, 707 So.2d at 570. This Court agrees with the findings of the Mississippi Supreme Court. Nothing in the record indicates that the State of Mississippi intentionally delayed re-indictment of Beckwith until 1990 in order to gain a tactical advantage.

Supporting the proposition that the State intentionally delayed his re-indictment, Beckwith relies on a quote from the State's brief filed with the Mississippi Supreme Court. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, Exhibit "X." Describing the reason for the delay in Beckwith's re-indictment, the brief states "[t]he reason for the delay is simple; the district attorney had brought Beckwith to trial twice and, with the political and emotional climate of the time, was justified in assuming that a third trial, with an all-white jury, would reach the same conclusion." *Id.* Beckwith argues that this quote provides proof that the State delayed re-indictment until a more favorable racial climate for prosecution developed. Beckwith's argument is not well taken. The quote proves nothing more than the obvious; because of the racial climate in Mississippi in the 1960's, a third prosecution of Beckwith would have been fruitless and a waste of state resources. Nothing in the quote proves that the State intended to re-indict Beckwith at a later date. To the contrary, statements made by the Mississippi District Attorney in 1987 indicate that Mississippi had no intention of re-indicting Beckwith in the mid–1980's. The State did not re-indict Beckwith until 1990, after release of the Sovereignty Commission files revealed that Beckwith's 1964

trial defenses were aided by the Sovereignty Commission. For these reasons, this Court finds that the State of Mississippi did not intentionally delay re-indictment of Beckwith in order to gain a tactical advantage.

**(b) Whether Beckwith's Due Process Claim is Viable in the Absence of Proof of an Intentional Delay by the State**

This issue compels the Court to decide whether Beckwith can successfully assert a due process violation claim in the absence of proven intentional delay by the State. The question facing the Court is whether the two-prong test for a due process violation resulting from pre-indictment delay is an "and" test, or an "or" test. If the test is an "and" test, then satisfaction of both the intentional delay element and the prejudice to the defendant element is necessary to successfully assert a claim of due process violation. If the test is an "or" test, then both factors must be considered and balanced.

This issue was addressed by both the United States Supreme Court and the Fifth Circuit Court of Appeals. In *Lovasco*, the United States Supreme Court held "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as prejudice to the accused." *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048–49 (citing *Marion*, 404 U.S. at 324–25, 92 S.Ct. at 465). The holdings in *Lovasco* and *Marion* were analyzed by the Fifth Circuit in *United States v. Crouch*, 84 F.3d 1497 (5th Cir.1996),

*cert. denied*, 519 U.S. 1076, 117 S.Ct. 736, 136 L.Ed.2d 676 (1997). Recognizing that neither *Lovasco* nor *Marion* are definitive on the issue of whether proof of *both* intentional delay by the government *and* prejudice to the defendant are required for a successful due process claim, the Fifth Circuit in *Crouch* held "we believe that the better reading of these opinions is that the Supreme Court, in instances where the statute of limitations has not run, has refused to recognize a claim of pre-indictment delay absent some bad faith or improper purpose on the part of the prosecution." *Id.* at 1510 (citation omitted). *Crouch* establishes the test in the Fifth Circuit: a Defendant must prove prejudice to his case resulting from pre-indictment delay *and* that the government intentionally delayed the indictment process to gain a tactical advantage.[15] A majority of circuits follow the same rule, including the District of Columbia Circuit, the First Circuit, the Second Circuit, the Third Circuit, the Sixth Circuit, the Seventh Circuit, the Tenth Circuit and the Eleventh Circuit. *Id.* at 1511–12 (citations omitted).

 Based on the holdings in *Lovasco*, *Marion* and *Crouch*, this Court finds that Beckwith must prove not only prejudice to his defense but also that the government intentionally delayed his indictment in order to gain a tactical advantage. Because Beckwith failed to prove that the State intentionally delayed his re-indictment until 1990 to gain a tactical advantage, his Fifth Amendment due process claim fails. For this reason, the Court need not consider whether Beckwith's defense was

---

**15.** In a Fifth Circuit case decided prior to *Crouch*, due process violations resulting from pre-indictment delay were analyzed in a different manner. *See United States v. Townley*, 665 F.2d 579 (5th Cir.1982), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). In *Townley*, the court held that a defendant must first prove prejudice resulting from a pre-indictment delay. *Id.* at 581–82 (citation omitted). After this threshold requirement is met, the court balances the prejudice to the defendant against the govern-

ment's need for an investigative delay. *Id.* at 582 (citation omitted). Under *Townley*, Beckwith's due process claim could possibly survive absent a showing of intentional delay on the part of the State. However, *Crouch* specifically rejected the *Townley* balancing test, holding that intentional delay by the government is an essential element for a due process claim arising out of pre-indictment delay. *Crouch*, 84 F.3d at 1514. Therefore, the *Townley* balancing test does not apply to Beckwith's due process claim.

prejudiced by the pre-indictment delay. However, in the event that this Court is in error in regard to the indictment delay issue, the Court will, in the alternative, analyze whether the ruling of the Mississippi Supreme Court on the issue of prejudice was in accord with established federal law.

### (2) Factor #2: Whether Beckwith Was Prejudiced by the Delay in His Re-indictment

 The Fifth Circuit has set forth several guidelines to determine whether a defendant is prejudiced by a pre-indictment delay. The mere passage of time is insufficient to prove prejudice to the defendant. *United States v. Butts*, 524 F.2d 975, 977 (5th Cir.1975). To establish a due process claim based on pre-indictment delay, the defendant must prove actual prejudice; presumed prejudice is insufficient. *Beszborn*, 21 F.3d at 66. A due process claim is merely speculative without proof of actual prejudice. *Id.* "Vague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from pre-indictment delay." *Id.* at 67 (citations omitted). To support a due process claim through allegations of lost or unavailable witnesses, the defendant must show that "their testimony 'would have actually aided the defense.'" *Crouch*, 84 F.3d at 1515 (citations omitted). Based on these guidelines, this Court will determine whether the holding of the Mississippi Supreme Court on the issue of prejudice to Beckwith's defense was in accordance with federal law.

 Holding that Beckwith did not prove prejudice to his defense resulting from the pre-indictment delay, the Mississippi Supreme Court in *Beckwith II* relied primarily on *Beszborn*. The court stated:

> Beszborn had shown nothing that the deceased witnesses would say which would have affected the case, nor did he show anything that could be proved by any missing or misplaced documents. Beckwith is in the same position. Witnesses for both the state and the de-

fense had died in the interim between the trials, but testimony from previous trials was available and was read to the jury. Beckwith did not put into the record any facts he could have proved by these deceased witnesses that did not go to the jury through their prior testimony. Nor does his claim of memory loss fare any better.

*Beckwith II*, 707 So.2d at 570. In the Petition for Habeas Corpus Relief, Beckwith details twenty-four separate elements that he claims prejudiced his defense. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, pp. 23–30. Because Beckwith failed to prove that the State intentionally delayed his re-indictment for tactical reasons, which results in failure of his speedy trial due process claim, each of these elements will not be individually analyzed. However, this Court recognizes that the elements which allegedly constitute prejudice were considered and rejected by the Mississippi Supreme Court in *Beckwith II. See Beckwith II*, 707 So.2d at 568–71. The holding of the Mississippi Supreme Court did not violate clearly established federal law. To the contrary, the court relied primarily on federal case law in its analysis. Therefore, the finding of the Mississippi Supreme Court will not be disturbed by this Court.

### (3) Conclusion: Beckwith's Fifth Amendment Due Process Right to a Speedy Trial

The Mississippi Supreme Court found that Beckwith proved no due process violation which justified overturning the jury's verdict. *Beckwith II*, 707 So.2d at 570. Under the deference scheme of AEDPA, this Court will not disturb the ruling of the Mississippi State Supreme Court unless its conclusions involve an unreasonable application of clearly established federal law. *See Davis*, 158 F.3d at 812 (citations omitted). The decision of the Mississippi Supreme Court does not violate clearly established federal law. Under the deference standard of AEDPA, a finding that the

state court's holding was in accord with federal law is sufficient to deny habeas corpus relief. However, in the interest of justice, this Court independently analyzed the "intentional delay" prong of the due process test and found that the State did not intentionally delay re-indictment of Beckwith. Alternatively, this Court independently analyzed the "prejudice" prong and found no prejudice to Beckwith. Based on this Court's own analysis and the findings of the Mississippi Supreme Court, this Court holds that Beckwith's Fifth Amendment due process right to a speedy trial was not violated. Beckwith cannot be granted habeas corpus relief based on alleged violations of his Fifth Amendment due process right to a speedy trial.

### D. Alleged Discovery Violations as They Relate to Beckwith's Fifth Amendment Due Process Rights and Fair Trial Rights, and Beckwith' Sixth Amendment Compulsory Process Rights

Beckwith alleges that his Fifth Amendment due process rights and fair trial rights were infringed by a number of discovery violations. The alleged violations concern five witnesses who either testified at his 1994 trial, or were prohibited from testifying by the trial court. In *Beckwith II*, the Mississippi Supreme Court held that Beckwith's constitutional rights were not violated by admission or exclusion of the testimony in question. *Beckwith II*, 707 So.2d at 571–78. Based on the deference standards of AEDPA, this Court will not overturn the decisions of the Mississippi Supreme Court unless they are found to be so clearly incorrect that reasonable jurists would agree that the decisions were erroneous. *See Nobles*, 127 F.3d at 418 (citation omitted). Each of the alleged violations is considered in the order in which they are raised in Beckwith's Memorandum Brief.

### (1) Martha Jean O'Brien, Defense Witness

Background information concerning defense witness Martha Jean O'Brien is rela-tively detailed. In *Beckwith II*, the Mississippi Supreme Court summarized as succinctly as possible O'Brien's role in the proceeding, as it relates to Beckwith's Fifth Amendment due process and fair trial claim. The Mississippi Supreme Court stated:

Martha Jean O'Brien was an employee of Joe's Drive–In who was on duty the night of Medgar Evers' murder. Soon after the murder, Ms. O'Brien gave a statement to police that she had seen a man in a white Plymouth Valiant pull into the drive-in on the night of the murder. She described the man as in his early twenties, slender, tall, and with dark curly hair and a full mustache covering his lip, which description did not match that of Byron De La Beckwith. Because there were no discovery rules in place at the time, the defense was unaware of this statement during Beckwith's 1964 trials. In her testimony during the first trial, Ms. O'Brien described the man she saw as being in his early twenties, very good looking and about six feet four inches tall.

Pursuant to discovery requests prior to the 1994 trial, the prosecution provided defense counsel with a copy of Ms. O'Brien's police statement and a transcript of her 1964 testimony. Being unable to locate Ms. O'Brien through all available means, including searches by investigators appointed by the trial court, the defense moved to have her 1964 testimony read to the jury. The prosecution stipulated that Ms. O'Brien could not be found, and her testimony was read to the jury. The trial judge denied defense counsel's request to read Ms. O'Brien's police statement to the jury.

On February 3, 1994, after the defense had rested and on the evening before closing arguments were to begin, defense counsel received a telephone call from Ms. O'Brien. She apparently called Mr. Kitchens because she had seen on television that the trial was al-

most over. Ms. O'Brien told Mr. Kitchens that she had gone to the District Attorney's office on August 11, 1993, at which time she was given an outstanding subpoena. She said the District Attorney's office never called her back, so she called and spoke to Mr. DeLaughter the night before the trial started. According to Ms. O'Brien, Mr. DeLaughter told her that Mr. Crisco would contact her when she was needed. When she saw on television that the trial was almost over, she decided to call Mr. Kitchens. Apparently, however, her address and telephone number had changed, for she told Mr. Kitchens that the District Attorney's office did not know where she was. She said that on the two occasions when she spoke to prosecutors, she had contacted them, and they did not have her address or telephone number. When Mr. Kitchens asked her if she still went by the name Martha Jean O'Brien, she said she did not and hung up without giving her name, address or telephone number. This conversation was recorded by Mr. Kitchens.

The following morning, defense counsel moved to call Mr. DeLaughter and Mr. Crisco to testify, outside the presence of the jury, regarding these troubling incidents. The trial judge ruled that defense counsel could present this matter after closing arguments. When called to testify after closing arguments, Mr. DeLaughter admitted that he had spoken to Ms. O'Brien on the two occasions which she described to Mr. Kitchens. He testified that when defense counsel informed him that the defense intended to have Ms. O'Brien's prior testimony read to the jury because she could not be found, Mr. DeLaughter went to his office to call the telephone number he had for Ms. O'Brien to see if he could find her. Upon calling the number, he reached a business, American General Finance, and so he returned to the courtroom and stipulated to Ms. O'Brien's transcript testimony being introduced because she could not be found. Mr. DeLaughter testified that the

first indication he had that the defense was looking for Ms. O'Brien was when defense counsel sought to introduce her prior testimony, and that prior to that, "[a]bsolutely it was not mentioned."

The defense then called Charlie Crisco, an investigator with the District Attorney's office, who testified that he had had Ms. O'Brien's address and telephone number since August of 1992, which was the last time he spoke with her. The record is unclear whether this address and phone number were current as of the time of trial.

The defense then called defense attorney Merrida Coxwell, who testified that on August 3, 1992, when the trial court heard Beckwith's motion to dismiss the case as a violation of his speedy trial right, Mr. Coxwell argued to the court that the defense was prejudiced by its inability to locate Martha Jean O'Brien. Mr. Coxwell testified that Mr. DeLaughter and District Attorney Peters were both present in the courtroom that day. At the close of this testimony, the defense moved for a mistrial, which motion the trial court took under advisement until after the jury completed its deliberations, at which time the judge overruled the motion. Defense counsel subsequently located Ms. O'Brien, and submitted with Beckwith's post-trial motions an affidavit by her detailing her aforementioned contact with the District Attorney's office.

*Beckwith II,* 707 So.2d at 571–72.

Beckwith contends that the trial court erred in two respects. First, the trial court erred by refusing to hear the O'Brien matter before closing arguments were made. Beckwith argues that if the trial court had heard the matter before closing arguments, the defense could have moved to re-open the case. Second, trial court erred in overruling Beckwith's motion for a mistrial. Beckwith further contends that the Mississippi Supreme Court erred by upholding the decisions of the trial court.

██ The rules of discovery in Mississippi require that "upon defense request, the prosecution [must] disclose the names and addresses of all material witnesses. The rule extends to witnesses who may not be called at trial, where the witness may be reasonably expected to be helpful to the defense." *Gowdy v. State*, 592 So.2d 29, 34 (Miss.1991) (citing Rule 4.06(a)(6), Miss. Unif.Crim.R.Cir.Ct.Prac. (1979, as amended); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (other citation omitted). As this Court interprets the language of *Beckwith II*, the Mississippi Supreme Court found that the State *was* under an obligation to provide the last known address and telephone number of O'Brien to the defense. *Beckwith II*, 707 So.2d at 572. This Court concurs; under both *Brady v. Maryland*[16] and the Mississippi Uniform Criminal Rules of Circuit Court Practice which were in effect at the time that *Beckwith II* was tried, the prosecution had an obligation to turn over the last known address and telephone number of O'Brien to the defense. However, the failure to provide this information does not necessarily rise to the level of a Fifth Amendment due process or fair trial violation.

The Mississippi Supreme Court considered whether the State violated Beckwith's Fifth Amendment due process and fair trial rights by failing to provide O'Brien's last known address and telephone number. Quoting *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197, the *Beckwith II* court held that a Fifth Amendment violation occurred only if "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Beckwith II*, 707 So.2d at 572 (citation omitted). Applying this test to the facts of the case *sub judice*, the *Beckwith II* court proceeded to define the phrase "materiality of evidence not disclosed to the defense" as follows: "The evidence is material only if there is a reasonable probability that,

had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Beckwith II*, 707 So.2d at 572 (quoting *United States v. Bagley*, 473 U.S. 667, 681, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)) (other citation omitted). The legal standards set forth by the Mississippi Supreme Court are adopted by this Court.

Having concluded that the prosecution had an obligation to provide O'Brien's last known address and telephone number to the defense, two separate but related questions are analyzed. First, this Court will analyze the decisions of the Mississippi Supreme Court under the deference standards of AEDPA. In summary, this Court will not overturn the decisions of the Mississippi Supreme Court unless they are found to be so clearly incorrect that reasonable jurists would agree that the decisions were erroneous. *See Nobles*, 127 F.3d at 418 (citation omitted). Second, although not required by AEDPA, the Court will independently analyze the issue of whether Beckwith's Fifth Amendment due process and fair trial rights were infringed upon by the discovery violation.

Applying the legal standard set forth above to the facts of Beckwith's case, the Mississippi Supreme Court concluded that Beckwith's Fifth Amendment due process and fair trial rights were not violated. *Beckwith II*, 707 So.2d at 573. In so finding, the court relied on the fact that the transcript of O'Brien's testimony from the first trial of Beckwith in 1964 was read to the jury. *Id.* at 572. The transcript testimony included a description of the man alleged to be Beckwith at Joe's Drive–In. *Id.* The description did not match Beckwith's physical characteristics. *Id.* Because the jury was exposed to this testimony, the court found that if O'Brien had

---

16. Upon request by the defendant, the prosecution must provide evidence favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). Respondents do not dispute the fact that the defense made a Rule 4.06 discovery request, which covers exculpatory evidence.

been available for live testimony, her testimony would not have been "sufficient to undermine confidence in the outcome of the trial." *Id.* at 573. Additionally, the Mississippi Supreme Court supported its position by emphasizing that if O'Brien had been available to testify live, the prosecution could have impeached O'Brien on her inaccurate description of the man alleged to be Beckwith. *Id.* Because the prosecution was unable to impeach O'Brien, her absence may have benefitted the defense. *Id.* Based on the deference standards of AEDPA, this Court finds that the holding of the Mississippi Supreme Court in *Beckwith II* was not so clearly incorrect that reasonable jurists would agree that the decision was erroneous. Therefore, the finding of the Mississippi Supreme Court will not be overturned.

 This Court now proceeds with an independent analysis of the alleged Fifth Amendment due process and fair trial claim, as it relates to defense witness O'Brien. In a police report dated June 12, 1963, O'Brien described the man at Joe's Drive–In, who was alleged to be Beckwith, as a dark complected white male with dark hair and a mustache. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, Exhibit "KK," p. 2. O'Brien further described the man as about six feet to six feet two inches in height, slim build, with a body weight of about one hundred and sixty pounds. *Id.* The trial court did not allow the contents of the police report to be read to the jury in *Beckwith II*. However, the transcript of O'Brien's testimony from Beckwith's first trial in 1964 was read to the *Beckwith II* jury. In the portions of the transcript read in *Beckwith II*, O'Brien described the man at Joe's Drive–In as "very tall" and in his early twenties. (R. at 2855). She further described the man as approximately six feet four inches tall. (R. at 2857–58). In the 1964 trial, O'Brien described the height of the man alleged to be Beckwith by comparing him to another man whose height was known to be six feet one inch tall. (R. at 2858). She stated that the man alleged

to be Beckwith was two to three inches taller than the known subject of comparison, who was six feet one inch tall. *Id.* Finally, O'Brien again described the man alleged to be Beckwith as six feet and four inches tall. (R. at 2861).

Under the standards of *Brady* and *Bagley* set forth above, the failure of the prosecution to give the last known address of O'Brien to the defense is a Fifth Amendment due process and fair trial violation only if there is a reasonable probability that the result of the trial would have been different had O'Brien testified live. The obvious value of O'Brien's testimony to the defense was her errant physical description of the man alleged to be Beckwith. Her description was at odds with Beckwith's actual height and age. Beckwith's actual height was about five feet eight inches and he was significantly older than his "early twenties" in 1963. The potential value of live testimony by O'Brien is diminished by the fact that the *Beckwith II* jury was read O'Brien's transcript from Beckwith's 1964 trial, which contained four erroneous descriptions of Beckwith's height and one erroneous description of his age. In fact, in the 1963 police report that the defense moved to be read to the jury, O'Brien described Beckwith's height as "about 6 ft to 6 ft 2 inches tall," a description that more closely matched Beckwith's actual height than the jury was exposed to via O'Brien's transcript testimony. *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, Exhibit "KK," p. 2. Therefore, neither the lack of live testimony by O'Brien nor the failure of the trial court to allow the police report to be read to the jury constitutes a Fifth Amendment due process or fair trial violation.

The Court finds that the failure of the State to provide O'Brien's last known address and telephone number was not a violation of Beckwith's Fifth Amendment due process right or Beckwith's right to a fair trial. Failure to provide the location of O'Brien to the defense did not under-

mine the confidence in the outcome of Beckwith's trial. Therefore, the trial court did not err by refusing to hear the matter before closing arguments were made or in overruling Beckwith's motion for a mistrial. For these reasons, habeas corpus relief cannot be granted based upon the unavailability of defense witness Martha Jean O'Brien.

### (2) James Hobby, Defense Witness

In *Beckwith II,* the Mississippi Supreme Court succinctly summarized the role of defense witness James Hobby. This Court incorporates the following summary from *Beckwith II.*

James Hobby was a defense witness who was prepared to testify that he owned a white Plymouth Valiant matching the description of the car seen at Joe's Drive–In on the night of Evers' murder. According to Mr. Hobby, he parked his car at the drive-in on the night of the murder, and his was the only white Valiant parked at the drive-in. He was prepared to testify also that he heard a gunshot coming from the nearby woods at the time of the murder.

When the defense called Mr. Hobby to testify, the prosecution objected and moved to exclude his testimony on the grounds that defense counsel had not provided Mr. Hobby's name as a witness until mid-way through the trial when the State had rested its case in chief. The trial court adjourned for the day and ordered that the prosecution be allowed to interview the witness.

When the court reconvened the next day, the prosecution, having interviewed Mr. Hobby the previous evening, renewed its objection. The prosecutor stated that Mr. Hobby's name was not on the list of witnesses provided by defense counsel prior to trial, and pointed out that when the State read this list to the jury during voir dire, defense counsel did not point out the omission of Mr. Hobby's name. The prosecutor argued that the State had absolutely no notice until the defense began putting on evidence that Mr. Hobby would be called to testify. The prosecutor pointed out that one of the State's witnesses, Barbara Holder, had worked at the drive-in and knew Mr. Hobby well. [[FN 1] The prosecution had become appraised of this information the previous evening.] Had the prosecution known of Mr. Hobby's identity as a witness and the substance of his testimony, the prosecutor argued, the State would have called Ms. Holder to rebut Mr. Hobby's testimony. As it stood, however, Ms. Holder had been excused after testifying and had returned to Texas.

Defense counsel responded that he had discussed with Mr. DeLaughter the names of all defense witnesses and "I had no reason to hide Mr. Hobby's name." Mr. DeLaughter countered that he had never been furnished with Mr. Hobby's name.

*Beckwith II,* 707 So.2d at 573; *see also* (R. at 2833–47).

Based on arguments by counsel, the Mississippi Supreme Court explained that it had to "rely on the representations of the attorneys," which were at odds with one another. *Beckwith II,* 707 So.2d at 573; *see also* (R. at 2843–44). Therefore, the court was forced to "fall back upon the strict letter of the law...." *Id.* The court denied Hobby the opportunity to testify because applicable law required both the prosecution and the defense to provide the names of all witnesses to the opposing party in writing, and Hobby's name was not so provided to the prosecution. *Beckwith II,* 707 So.2d at 573; *see also* (R. at 2844).

Beckwith argues that under *Box v. State,* 437 So.2d 19 (Miss.1983), and *Houston v. State,* 531 So.2d 598 (Miss.1988), the trial court should have allowed the prosecution time to investigate Hobby's proffered testimony rather than excluding him as a defense witness. Under the AEDPA deference scheme, this court will not overturn the ruling of the Mississippi Supreme Court unless the ruling involves "an unreasonable application of clearly established

*federal law.... " Davis,* 158 F.3d at 812 (citing 28 U.S.C. § 2254(d)(1)) (other citations omitted) (emphasis added). Based upon the language of § 2254 and the holding in *Davis,* this Court looks to federal law rather than Mississippi law to determine whether Beckwith's constitutional rights were violated by the trial court's bar of Hobby's testimony.

As a preliminary matter, the Court clarifies the legal categorization of this issue. In Beckwith's Petition, all alleged discovery violations are categorized as "Mr. Beckwith's Right to a Fair Trial and Due Process Under the *Fifth Amendment....* " *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, p. 44 (emphasis added). A leading federal case on the issue of witness exclusion is *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). In *Taylor,* the United States Supreme Court analyzed the issue of witness exclusion under the Compulsory Process Clause of the Sixth Amendment. *Id.* at 402, 108 S.Ct. at 649. Therefore, this Court will consider the witness exclusion issue as it relates to defense witness Hobby under the Compulsory Process Clause of the Sixth Amendment.

The *Taylor* Court held that sanctions other than preclusion of the testimony of an undisclosed witness are appropriate in most cases. *Id.* at 413, 108 S.Ct. at 655. However, the Court qualified its statement by finding that lesser sanctions can perpetuate rather than limit prejudice in some instances. *Id.* Additionally, lesser sanctions, such as granting a continuance, can harm the adversary process. *Id.* One of the reasons for requiring the disclosure of witnesses is prevention of fabricated testimony. *Id.* Considering the possibility of fabricated evidence when witnesses are not timely disclosed, the *Taylor* Court stated:

> It is ... reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed. If a pattern of discovery violations is explicable only on the assumption that the violations were designed to conceal a plan

to present fabricated testimony, it would be entirely appropriate to exclude the tainted evidence regardless of whether other sanctions would also be merited. *Taylor,* 484 U.S. at 414, 108 S.Ct. at 655. If willful misconduct is involved on the part of the nondisclosing party, then an appropriate sanction is preclusion of the nondisclosed witness' testimony. *Id.* at 417, 108 S.Ct. at 657. Furthermore, if the omission is based on a desire to obtain a tactical advantage at trial, then "it would be entirely consistent with the purpose of the Compulsory Process Clause simply to exclude the witness' testimony." *Id.* at 415, 108 S.Ct. at 656.

■ Applying the standards of *Taylor* to the nondisclosure of defense witness Hobby, the Mississippi Supreme Court justified exclusion of Hobby's testimony for several reasons. The defense was aware that Hobby would be used as a witness some time prior to trial. *Beckwith II,* 707 So.2d at 575. Not only did the defense fail to produce in writing Hobby's name as a potential witness prior to trial, but also the defense did not point out the omission of his name when the list of defense witnesses was read to the jury during voir dire. *Id.* Furthermore, the defense was aware of the relationship between Barbara Holder and Hobby when the State called Holder as a witness. *Id.* After Holder was excused by the court and returned to Texas, and after the prosecution rested its case, the defense finally produced Hobby's name as a witness. *Id.* For these reasons, the Mississippi Supreme Court concluded that the willful conduct of defense counsel was motivated by a desire to gain a tactical advantage at trial. *Id.* The Mississippi Supreme Court held that no constitutional violation resulted from the trial court's bar of Hobby's testimony. *Id.* at 576. This Court concurs.

In support of his position, Beckwith's Memorandum Brief states "Mr. Beckwith's counsel were not aware that Ms. Holder knew Mr. Hobby or that she could rebut

his testimony. Mr. Beckwith's counsel were unaware of any alleged connection between Hobby and Holder, so there could have been no motivation on their part to obtain a tactical advantage." *See* Memorandum Brief in Support of Petitioner Byron De La Beckwith, VI's Petition for Habeas Corpus, p. 56. This argument is squarely contradicted by the record. In Beckwith's trial in 1994, counsel for Beckwith was allowed to proffer the testimony of Hobby outside the presence of the jury. The proffered testimony included the following statement: "He [Hobby] knew the waitress or car hop who's been referred to, Barbara Holder, but she was not there." (R. at 2845). At a minimum, the defense was aware that Holder's testimony was in conflict with the proposed testimony of Hobby. The proffered testimony of Hobby provides additional support for the decision of the Mississippi Supreme Court.

One additional quote from *Taylor* bears consideration by this Court. "In order to reject petitioner's argument that preclusion is never a permissible sanction for a discovery violation it is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case." *Taylor*, 484 U.S. at 414, 108 S.Ct. at 656. The language in *Taylor* indicates that preclusion of a witness based on discovery violations is a flexible decision based on the particular circumstances of each case. Based on the defense's knowledge of the contents of Hobby's potential testimony and the failure of the defense to provide Hobby's name to the prosecution in a timely manner, this Court is convinced that preclusion of his testimony was proper.

Beckwith's final argument is that the trial court enforced discovery rules in a discriminatory manner. Beckwith supports this argument with the fact that defense witness Hobby was not allowed to testify while prosecution witnesses who were the subjects of alleged discovery violations were allowed to testify. This argument is not well taken. State witness Bowen Johnson was excluded from testifying for the same reason that Hobby was excluded; his name was not provided to the defense in a timely manner. *Beckwith II*, 707 So.2d at 575–76. This fact negates Beckwith's claim of discriminatory treatment.

The Court finds that exclusion of James Hobby as a defense witness by the trial court was not a violation of Beckwith's Sixth Amendment compulsory process rights. Therefore, the upholding of the trial court's decision by the Mississippi Supreme Court will not be overturned and habeas corpus relief cannot be granted on this ground.

### (3) State Witness Mark Reiley, State Witness Tom Van Riper, State Witness Mary Ann Adams

Mark Reiley, Tom Van Riper and Mary Ann Adams were all allowed to testify as State witnesses in Beckwith's 1994 trial. The defense objected to the testimony of all three of these witnesses during the trial. Beckwith's Petition for Habeas Corpus Relief cites as error the trial court's admission of their testimony. However, the objections in the Petition rely on no "clearly established federal law," which is required under AEDPA before this Court can review the state court rulings. *See Davis*, 158 F.3d at 812 (citing 28 U.S.C. § 2254(d)(1)) (other citations omitted). Therefore, this Court must determine the authority under which the state court evidentiary rulings concerning Reiley, Van Riper and Adams may be reviewed.

In a number of cases the Fifth Circuit has considered the role of federal courts in reviewing state court evidentiary rulings. "[E]rrors of state law, including evidentiary errors, are not cognizable in habeas corpus as such." *Derden v. McNeel*, 978 F.2d 1453 (5th Cir.1992), *cert. denied*, 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993) (citing *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)) (other citation omitted). A constitutional violation arises out of errors in state law only if the error "so infused the

trial with unfairness as to deny due process of law." *Derden,* 978 F.2d at 1458 (citing *Lisenba v. California,* 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941)) (other citation omitted). Additionally, an erroneous state court evidentiary ruling rises to a constitutional level if it renders the petitioner's trial fundamentally unfair. *Gochicoa v. Johnson,* 118 F.3d 440, 446 (5th Cir.1997) (citing *Cupit v. Whitley,* 28 F.3d 532, 536 (5th Cir.1994), *cert. denied,* 513 U.S. 1163, 115 S.Ct. 1128, 130 L.Ed.2d 1091 (1995)). The Fifth Circuit defines an "unfair trial" as "one that has been 'largely robbed of dignity due a rational process.' " *Johnson v. Blackburn,* 778 F.2d 1044, 1050 (5th Cir.1985) (quoting *Houston v. Estelle,* 569 F.2d 372, 383 (5th Cir.1984)) (other citation omitted).

 Interpretation of the aforementioned cases imposes a two-phase obligation on this Court. First, the Court must consider whether the admission of the testimony of Reiley, Van Riper and Adams was a violation of Mississippi state law. If admission of the testimony was a violation of state law, then the Court must proceed to phase two of the analysis. The second factor to consider is whether the effect of the testimony rose to the level of a due process violation, resulting in a fundamentally unfair trial. Each of the three witnesses in question is considered under this two-phase analysis.

### (a) Mark Reiley, State Witness

In *Beckwith II,* the Mississippi Supreme Court summarized all relevant background information concerning State witness Mark Reiley. This Court adopts the following summary set forth by the *Beckwith II* court.

> During the trial, on Friday, January 28, 1994, the District Attorney's office received a telephone call from Mark Reiley, who was calling from Chicago, Illinois, and who said he had seen news coverage of the Beckwith case on CNN. Mr. Reiley's name was not reflected in the records of either party. He told the prosecutors that while he was guarding Byron De La Beckwith at Angola State

> Penitentiary in Louisiana in 1979, Beckwith confessed to killing Medgar Evers. [[FN2] Beckwith was convicted in New Orleans in 1973 of knowingly transporting a bomb without a license or permit, and was sentenced in 1975 to five years incarceration in the Louisiana Department of Corrections. His appeal of this conviction was affirmed. *State v. de la Beckwith,* 344 So.2d 360 (La.1977). The conviction was later vacated by the Criminal District Court of Orleans Parish, Louisiana on August 3, 1992.] The prosecution immediately related this information to the trial court and defense counsel, and informed defense counsel that Mr. Reiley would be flying into Jackson the next day and would be available for questioning. On Sunday, January 30, District Attorney Peters notified defense counsel that Mr. Reiley had arrived and would be available for questioning the next day. Defense counsel was able to interview Mr. Reiley during lunch on Monday, January 31.

> When the State called Mr. Reiley to testify, defense counsel objected on the grounds that the defense had had no opportunity to investigate Mr. Reiley's testimony. Defense counsel argued that more time was needed in order to retrieve records from Angola State Penitentiary and question other guards. The trial judge overruled the objection and allowed Mr. Reiley to testify.

*Beckwith II,* 707 So.2d at 576.

In *Overstreet v. State,* 369 So.2d 275, 277 (Miss.1979), the Mississippi Supreme Court analyzed the effect of erroneous admission of evidence when the evidence in question is merely cumulative in nature. The *Overstreet* court emphasized that the purpose of witness disclosure is to minimize the element of surprise to the opposing party. *Id.* If the evidence presented by the witness in question is merely cumulative to evidence presented by other sources, then the element of surprise is minimized. *Id.* Furthermore, admission of evidence is largely within the discretion of

817

the trial court. *Id.* (citing *Armstrong v. State,* 214 So.2d 589 (Miss.1968), *cert. denied,* 395 U.S. 965, 89 S.Ct. 2109, 23 L.Ed.2d 750 (1969)).

 Applying the holding in *Overstreet* to Beckwith's case, the Mississippi Supreme Court ruled that because the testimony of Reiley was cumulative to the testimony of other witnesses, any error by the trial court was harmless. *Beckwith II,* 707 So.2d at 576. The court stated "Reiley was by no means the only witness to testify that Beckwith had bragged about killing Medgar Evers." *Id.* This Court agrees with the holding of the Mississippi Supreme Court that Reiley's testimony was merely cumulative.

The record reflects that four other witnesses testified that Beckwith made self-incriminating statements about the murder of Evers. The following quote is from the trial testimony of State witness Mary Ann Adams, wherein Adams describes a conversation between herself and Beckwith in 1966: "Said he [Beckwith] had not killed a man, but a damn chicken-stealing dog, and you know what you have to do with a dog—after it's tasted blood." (R. at 2437–38). Next, State witness Daniel R. Prince testified that Beckwith bragged about the murder of Evers to him. Prince testified that during the 1986 to 1987 time frame, Beckwith told him "I had a job to do and I did it. . . ." (R. at 2449). The "job" referred to the killing of Evers. (R. at 2450). The third witness to testify about self-incriminating statements made by Beckwith was State witness Peggy Morgan. Morgan testified that Beckwith stated "he killed Medgar Evers, a nigger, and . . . if this ever got out, that he wasn't scared to kill again." (R. at 2520). The fourth and final witness who testified about self-incriminating statements made by Beckwith was Delmar Dennis. At a 1965 Ku Klux Klan meeting attended by Dennis, Beckwith stated "[k]illing that nigger didn't cause me any more physical harm than your wives have to have a baby for you." (R. at 2547).

Assuming *arguendo* that the trial court erred by allowing Reiley to testify, the admission of his testimony was cumulative to the testimony of four other witnesses. Because Reiley's testimony was cumulative, any error in its admission did not rise to the level of a due process violation. Therefore, the holding of the Mississippi Supreme Court will not be disturbed. Habeas corpus relief cannot be granted on the basis of admission of the testimony of Mark Reiley.

**(b) Tom Van Riper, State Witness**

The Mississippi Supreme Court in *Beckwith II* accurately summarized the role of Van Riper in Beckwith's 1994 trial. This Court adopts the following quote from *Beckwith II:*

Delmar Dennis, an ex-FBI informant and former member of the Ku Klux Klan, testified for the State regarding an incriminating statement made by Byron De La Beckwith at a Klan meeting in 1965. Mr. Dennis testified that he related this statement to the FBI agent he worked with, although he could not remember at trial which agent it was. On cross-examination, defense counsel established that the statement attributed to Beckwith by Mr. Dennis was not recorded in the FBI files containing information reported by Mr. Dennis. The State then called ex-FBI agent Tom Van Riper to testify that Mr. Dennis had related Beckwith's statement to him. Defense counsel objected to the calling of Van Riper because Van Riper's name as a witness had not been provided to the defense until the first day of trial.

The prosecution apparently did not become aware that Van Riper was the recipient of this information from Mr. Dennis until the day before testimony began when, on his way back from jury selection in Batesville, Mr. DeLaughter read a book about Beckwith written by Reed Massengill. The next day, Mr. DeLaughter provided defense counsel with Van Riper's name and telephone

number, together with a photocopy of the passages in the book about which Van Riper would be questioned at trial.

Upon defense counsel's objection to the calling of Van Riper, the trial court called a recess to grant defense counsel's request for an opportunity to question the witness. When the court reconvened, defense counsel renewed his objection to any testimony by Van Riper as improper bolstering and a discovery violation. Defense counsel argued he had no opportunity "in the throes of the trial" to conduct any investigation of Van Riper's possible testimony. The trial court overruled the objection and allowed Van Riper to testify.

*Beckwith II,* 707 So.2d at 576–77.

Beckwith's claim that the admission of Van Riper's testimony was a violation of his due process or fair trial rights is flawed for two reasons. First, counsel for Beckwith did not ask for a continuance in the trial in order to prepare for the testimony of Van Riper. Second, Van Riper's testimony was cumulative to the testimony of four other witnesses; therefore, any error by the trial court in admitting his testimony was harmless error.

■■■ At the time of Beckwith's trial in 1994, Uniform Criminal Rule of Circuit Court Practice 4.06 was in effect.[17] Rule 4.06 states that a party who is surprised by evidence which is not timely disclosed must request either a continuance or a mistrial. Miss.Unif.Crim.R.Cir.Ct.Prac. 4.06 (1979, as amended). Beckwith requested neither. Therefore, any post-trial objection to Van Riper's testimony is deemed to be waived.

The second reason that Beckwith's constitutional claim arising out of Van Riper's testimony must fail is because the substance of Van Riper's testimony was cumulative to the testimony of four other witnesses. The purpose of Van Riper's testimony was to corroborate the testimony of State witness Delmar Dennis. Den-

nis testified to self-incriminating statements made by Beckwith. As analyzed above, other witnesses testified as to self-incriminating statements made by Beckwith. *See supra,* section II.D.(3)(a) of this Opinion and Order. As found by the Mississippi Supreme Court, if the admission of Van Riper's testimony was in error, the cumulative nature of the evidence renders the error harmless. *Beckwith II,* 707 So.2d at 577. For these reasons, this Court will not overturn the holding of the Mississippi Supreme Court and habeas corpus relief cannot be granted on this ground.

### (c) Mary Ann Adams, State Witness

With regard to foundation information concerning State witness Mary Ann Adams, this Court adopts the findings of the Mississippi Supreme Court in *Beckwith II.*

Mary Ann Adams, called by the State, testified that in September of 1966, she met Byron De La Beckwith in a restaurant outside Greenwood, Mississippi. She testified that Beckwith was introduced to her as "the man who killed Medgar Evers." Ms. Adams testified that when so introduced, Beckwith stuck out his hand to shake hers and was smiling and nodding. She testified that she told Beckwith he was a murderer and refused to shake his hand. Ms. Adams then testified that Beckwith became angry and told her "he had not killed a man, but a damn chicken-stealing dog, and you know what you have to do with a dog when—after it's tasted blood." This testimony about what Beckwith told Ms. Adams was not included in her recorded statement taken by the prosecution and provided to defense counsel during discovery.

On cross examination, defense counsel questioned Ms. Adams about this alleged statement by Beckwith. She tes-

---

**17.** The provisions of Rule 4.06 are now contained in Mississippi Uniform Circuit and County Court Practice Rule 9.04.

tified that she did not mention this comment when the prosecution took her taped statement on November 26, 1990, but that she told the prosecution of this comment in a second interview some months later. She could not remember whether anyone took her statement during the second interview. Ms. Adams admitted·that in her first interview, she stated that she did not remember what Beckwith said to her when she met him.

After cross-examination and outside the presence of the jury, defense counsel moved for a mistrial due to the prosecution's discovery violation in failing to supplement Ms. Adams' statement with this additional information. Assistant District Attorney DeLaughter responded that he had provided defense counsel with the only statement he had taken from Ms. Adams and that, although he had spoken with her several times, he did not keep notes and dates every time someone came to talk to him about the case. The trial court cautioned both sides to timely supplement their discovery disclosures as required by the rules, and overruled the motion for a mistrial. *Beckwith II*, 707 So.2d at 577.

■ This Court must first determine whether the prosecution was under a discovery obligation to turn over *oral* statements made by witnesses. If Adams' oral statement was discoverable, then the Court must determine whether failure to disclose the statement was reversible error. In *Moore v. State,* the Mississippi Supreme Court held that oral statements are discoverable. *Moore v. State,* 508 · So.2d 666, 668 (Miss.1987) (citing *Franklin v. State,* 460 So.2d 104, 106 (Miss.1984)). However, the *Moore* court further held that failure to disclose an oral statement is not necessarily reversible error. *Moore,* 508 So.2d at 668. If an oral statement is "sufficiently innocuous," it does not rise to the level of reversible error. *Id.* Under the standards of *Moore,* the prosecution was required to divulge oral statements made by Adams to the defense. However, as found by the Mississippi Supreme Court, the error in failing to divulge Adams' statements to the defense was harmless error for two reasons. *Beckwith II,* 707 So.2d at 577–78. First, rather than objecting to Adams' testimony during her direct examination, the defense chose to cross-examine her. *Id.* Dissatisfied with the responses elicited on cross-examination, the defense did not object to Adams' testimony until *after* cross was complete. *Id.* at 577, *see also,* (R. at 2437–39). Second, the cross-examination of Adams cast a disparaging light on her credibility. *Beckwith II,* 707 So.2d at 578. During cross-examination, Adams admitted that when she made her first recorded statement to the prosecution in 1990, she *did not remember* what Beckwith said to her at the restaurant when they met. *Id., see also,* (R. at 2442–44). Because Adams was discredited *on cross–examination* with regard to the oral statement in question, the statement was "sufficiently innocuous" under the standard of *Moore.* Therefore, failure of the prosecution to divulge the statement in a timely manner does not rise to the level of reversible error.

The Mississippi Supreme Court upheld the trial court's allowance of Adams' testimony because the defense waited until after cross-examination of Adams to move for mistrial, and because the defense was able to discredit Adams' allegedly tainted testimony on cross-examination. *Beckwith II,* 707 So.2d at 578. For these reasons, if the trial court wrongly admitted Adams' testimony, the error in its admission was harmless.

This Court agrees with the holding of the Mississippi Supreme Court. The admission of Adams' testimony neither rose to the level of a due process violation nor rendered Beckwith's trial fundamentally unfair. Habeas corpus relief cannot be granted based on the prosecution's failure to timely divulge Mary Ann Adams' oral statements to the defense.

### III. *Conclusion*

The legal system is challenged with protection of the constitutional rights of all citizens of this country. The protection of

individual rights must be administered by applying established law to the facts of each case. Based on application of the law to the facts of the case *sub judice,* this Court finds that the legal process by which Beckwith was convicted and sentenced to life imprisonment was not a violation of his Fifth or Sixth Amendment constitutional rights. Therefore, for all of the reasons analyzed by the Court, the Petition for Habeas Corpus Relief of Byron De La Beckwith is not well taken and should be denied.

IT IS THEREFORE ORDERED that Byron De La Beckwith's Petition for Habeas Corpus Relief [1–1] is hereby denied.